IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

                    Plaintiff-Respondent,

v.                                                                        No. CIV 02-767 MV/LFG
                                                                          No. CRIM 98-632 MV

RUBEN LUNA,

                    Defendant-Movant.


## MAGISTRATE JUDGE'S FINDINGS
## AND RECOMMENDED DISPOSITION[1]

### Findings

    1.      On June 28, 2002, Movant Ruben Luna ("Luna") motion filed a federal habeas petition

under 28 U.S.C. § 2255, to vacate, set aside or correct his sentence. [Doc. 1.]  The § 2255 motion

was fully briefed.  Luna requested an evidentiary hearing on his claims that trial counsel was

ineffective, or alternatively, a new trial.  [Doc. 3, at 15.]  The Court granted Luna's request for an

evidentiary hearing, directing the parties to address at the hearing a number of issues related to Luna's

claims.  [Doc. 11.]  On May 1, 2003, the Court held an evidentiary hearing, at which the government

was present and Luna was present with appointed counsel.  A court-appointed interpreter also was

---

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

present during the hearing.  Several witnesses were examined during the hearing, including Luna's

trial counsel, Timothy Woolston ("Woolston").  The parties each submitted written closing arguments

after the hearing.  [Docs. 18 and 19.]

### Background

2.        On June 3, 1999, a jury returned a guilty verdict on three counts against Luna –

conspiracy to possess more than 500 grams of cocaine with intent to distribute, possession of more

than 500 grams of cocaine with intent to distribute, and carrying a firearm in connection with a drug

offense.  [Order and Judgment, filed June 28, 2001, Ex. A1 to doc. 4.]  He was sentenced to 12 ½

years of imprisonment.  [Id.]  Luna is currently incarcerated at the Federal Prison Camp in Florence,

Colorado.

3.        Luna's federal habeas petition raises four separate Sixth Amendment ineffective

assistance of counsel claims in relation to his trial counsel's representation of him.  He asserts that

trial attorney Woolston[2] failed to explain the risks and benefits of the government's first plea offer

and to communicate a second plea offer that was allegedly offered by the government.  In addition,

Luna contends that Woolston's representation of him was constitutionally defective because of

Woolston's lack of pre-trial preparation and failure to provide a continuous interpreter for Luna,

whose primary language is Spanish.  He further asserts that Woolston's failure to file a motion for

new trial and his overall inadequate representation of Luna violated his Sixth Amendment right to

effective counsel.  [Doc. 1.]

4.        The government responds that none of Luna's claims have merit.  First, there was only

one plea offer made to Luna which the government believes Luna rejected because he had decided

---

[2]Woolston was retained to represent Luna by Luna's family and/or friends.

to take his chances with a jury.  Second, Luna identified no specific trial preparation that Woolston should have conducted.  Third, Luna did not provide any legitimate grounds to support a motion for new trial.  Further, to the extent that a new trial motion would have relied only on ineffective assistance of counsel claims, it would have been baseless.  Fourth, Luna's claim that Woolston's overall representation was inadequate is insufficiently specific.  Overall, the government argues that Luna failed to show any prejudice or that the outcome of the jury trial would have been different, but for counsel's alleged unprofessional errors.

5.      In the underlying briefing, the government did not address Luna's allegation that he was not provided with a "continuous interpreter," other than to say it was not privy to conversations or meetings between Woolston and Luna.  The government provided no discussion of whether Luna did or did not appear to understand English, or at what points he was provided with an interpreter during court proceedings.

6.      The government acknowledged that the trial judge, The Honorable Martha Vazquez, expressed concern during the sentencing proceedings that Luna had not received effective assistance of counsel during the trial and pre-trial proceedings.  [Doc. 9, at 20-21.]

7.      The Court has carefully reviewed the pertinent law, testimony presented at the evidentiary hearing, all of the submissions of the parties, including closing arguments, and the entire record proper.  For the reasons stated below, the Court recommends that Luna's habeas petition be granted to the extent that he be offered another plea bargain and/or receive a new trial.  The Court's reasoning follows.

## Factual and Procedural Summary

8.      Luna's conviction related to an undercover narcotics operation.  In August 1998, undercover Officer Mendez contacted Arturo Gandarilla in an attempt to purchase marijuana. Gandarilla was unable to supply Officer Mendez with marijuana but offered the possibility of cocaine from his supplier.  Officer Mendez and Gandarilla met at a bar, and Roberto Gomez, the supplier, then arrived.  Gomez gave Officer Mendez a sample of the cocaine, and Officer Mendez along with Officer Mora showed them the money.  Gomez wished to complete the transaction elsewhere because of a number of people outside the bar.  They drove to a new location where El Bronco, a mobile food stand, was located.  A short while later, Luna drove up in a pickup truck.  Either Gandarilla or Gomez, speaking in Spanish referred to the driver as "El Bueno" and told Mendez that the driver of the truck was the supplier.  One of them also said "Ya se iso."  Mendez testified that this meant "this is done" and indicated to him that "it's going to happen."

9.      Luna got out of his pickup carrying a white box which he handed to Gomez.  Gomez placed the box on the floorboard of his truck and closed the door.  Gomez then turned to Mendez and said something to the effect of "let's get this done."  Gomez opened the truck door and then opened the white box revealing two bags that turned out to contain 2 kilograms of cocaine.  The three men then were arrested and all three indicted.  Luna had a loaded 9-millimeter pistol concealed in the front waistband of his pants.  [Ex. A2-4, attached to Doc. 5.]

10.     Gomez was offered a plea bargain and he pled guilty to a conspiracy charge in the indictment and received a sentence of 30 months. [Ex. B6, attached to Doc. 5.]  On May 11, 1999, a jury trial began with respect to Luna and co-Defendant Gandarilla.  On May 13, 1999, a mistrial was declared after the prosecution mentioned during its examination of Gandarilla that Gandarilla had

been in custody since arrest.  On June 1, 1999, Gandarilla, who was also offered a plea bargain, entered a guilty plea to the conspiracy charge and received a sentence of 30 months.  Unlike Luna, neither Gomez nor Gandarilla was carrying a weapon.  Thus, Luna remained as the sole Defendant.

11.     Later on June 1, 1999, a jury was selected for the re-trial of Luna's case.  The second trial proceeded on June 2 and 3.  Both Gomez and Gandarilla testified on behalf of Luna at the second trial.  Gomez claimed that Luna was not involved in the cocaine sale and that Luna had handed Gomez a box that only contained six or seven compact discs previously loaned to Luna by Gomez. Gomez testified that Gomez removed the CDs from the box and replaced them with the cocaine that Gomez had concealed in his back seat.  Gomez also provided testimony detailing how he obtained the cocaine from another supplier earlier that evening.  Gomez testified that when he was looking for the other supplier, he ran into Luna who told him he wished to return the CDs to Gomez.  According to Gomez, Luna later came by El Bronco to return the CDs.

12.     Gandarilla also testified for Luna.  He stated that Gomez told him during their drive to El Bronco that he (Gomez) had the cocaine with him.  Gandarilla testified that he saw "two, two things behind the seat."  There was evidence presented at trial that it would have been difficult based on Officer Mendez's location and timing for Gomez to have switched the contents of the white box after Luna gave it to him.  [Ex. A7-A8, attached to Doc. 5.]

13.     On June 3, 1999, the trial jury rejected Gomez's and Gandarilla's testimony and convicted Luna.  Woolston did not file a motion for new trial, and according to Luna, Woolston did not discuss the possibilities of filing any post-trial motions. Luna also claims that Woolston had not been in touch with him after the mistrial and that Luna did not even know when the second trial was to commence until he was rushed to the courthouse on that day.  Luna states that Woolston did not

arrange for any interpreter from the time of the mistrial until the start of the second trial, and that he had no way to ask questions, convey objections or communicate with Woolston during the second trial.

14.     On July 30, 1999, after Luna was convicted, Woolston requested to withdraw as counsel of record, and his request was granted on August 4, 1999.  Mark Robert was appointed as new counsel for Luna on August 6, 1999.  On October 29, 1999, through Attorney Robert, Luna moved for a new trial and for leave to file the motion out of time, but his requests were denied.  On November 29, 1999, he was sentenced.  On January 7, 2000, he filed a timely notice of appeal.  On June 23, 2001, the Tenth Circuit affirmed his conviction.

15.     During sentencing Attorney Robert argued that Luna had not received a "fair shake" because of the "nature of his representation during trial."  Judge Vazquez noted that she did not know how to assess Luna's role based on the testimony at trial.  She expressed concerns about the adequacy of representation Luna received from Woolston and opined that Woolston's representation of Luna was "below the standard," but that by the time any motion was filed she had lost jurisdiction.

## Evidentiary Hearing

### *Ruben Luna's Testimony:*

16.     At the evidentiary hearing, Luna provided testimony that he was born in California but had grown up in Mexico during most of his childhood.  He did not learn English, although he later learned a little while in prison.  He could not speak English at the time of his trial.  According to Luna, trial counsel Woolston could not communicate in Spanish with him.  From time to time, Woolston would press into service friends, family, co-workers or even other inmates to communicate with Luna.  Luna testified that before the first trial, he met with Woolston about four to five times.

A woman, who could speak some Spanish, usually accompanied Woolston. This interpreter could not speak Spanish fully and carried a dictionary with her. Luna testified that the interpreter had difficulties explaining things to him and that he did not feel he fully understood the communications he had at the meetings with Woolston through Woolston's interpreter. Luna also stated that on one occasion, Woolston was accompanied by a retired attorney, who acted as an interpreter. The retired attorney's Spanish was a little better than the female interpreter's Spanish, who usually accompanied Woolston, but still Luna stated that communication between him and Woolston was difficult.

17.     At the hearing, Luna was asked if Woolston discussed with him, prior to his trials, any specific trial issues and the discovery produced by the government which consisted of 90 or more pages of documents. Luna testified that Woolston had conferred with him before the first trial but that the female interpreter was with him and communications were difficult. Luna did not remember seeing the 90 pages of discovery. He may have seen some of the documents but no one interpreted them from English to Spanish for him. Luna recalled being told that he was accused of a firearms charge and conspiracy to possess narcotics and about the co-defendants who were involved and the charges against them. Woolston did not discuss with Luna how the government witnesses were expected to testify. However, Luna thought Woolston might have tried to discuss some of the anticipated trial testimony but he never had a good translation of the discussion.

18.     Luna testified on cross examination by the government that the only time Woolston discussed a possible plea offer from the government was in relation to a verbal offer of 5 years where he would accept responsibility and the gun charge would be removed. According to Luna, Woolston told him that if he did not accept this deal, he would go to trial and that it would be better to go to trial as there was no evidence against him. Luna testified that he neither accepted nor rejected the

offer but relied on Woolston's advice because he believed Woolston knew what was best.  Luna had

the impression that Woolston encouraged him to proceed to trial rather than accept the offer.  Luna

further testified that he never informed Woolston that he wanted to plead guilty.  No written plea

agreement or offer was ever shown to, read to or translated for Luna.  Luna did not recall Woolston

ever discussing any other offer with him, nor an offer involving a 10-year plea.  Luna testified that

Woolston never discussed with him that he faced a minimum mandatory sentence of 5 years for the

drug charge.

19.     After the first trial ended in a mistrial, Luna recalled that Woolston told him to

telephone Woolston at his home.  Luna, who was in custody, called Woolston at the number

Woolston provided to him, but Luna did not speak personally to Woolston due to the need for an

interpreter.  Luna had an inmate at the detention facility speak to Woolston in English who then

translated Woolston's communications to Luna.  The inmate told Luna that Woolston stated the

prosecution had committed a "grave error" at the first trial and that Luna had a "99% chance of

getting free."  It is unknown whether Woolston actually made these statements, whether Luna simply

misunderstood what was said, or whether the statements were simply the product of a poor

translation.  Luna testified that Woolston told him, through the inmate interpreter, that Woolston

would communicate with him soon, that Luna would get out soon and not to worry.  Luna believed

Woolston because he trusted him at that time.

20.     Luna testified that Woolston had informed him that the maximum possible jail time

he could serve, if convicted, would be 8 years.  Luna provided this testimony despite the fact that the

sentencing guidelines for the firearms possession carried a minimum mandatory sentence of 5 years,

and the drug charge also carried a separate minimum mandatory sentence of 5 years.  Luna testified

that he did not know what the sentencing guidelines were before his trials, nor did he have any recollection of seeing them or discussing them with Woolston.

21.     Luna testified that he was never given the date of his second trial and did not speak to  Woolston again prior to his second trial.  Because he was not advised of the second trial date before it began, he ended up wearing the same clothes he was arrested in for all three trial days.

### *Trial Attorney Timothy Woolston's Testimony:*

22.     In 2002, subsequent to Luna's trial and prior to the Court's evidentiary hearing on Luna's petition, Woolston suffered a stroke.  Through physical therapy and rehabilitation, Woolston recovered, but the stroke caused significant memory loss.  As a result, Woolston could not provide evidence specific to this case.  Woolston testified that he did not recall Ruben Luna, his prior representation of Luna or the trials.  He could not even recognize Luna when he saw him at the evidentiary hearing.  Woolston is now 79 years old and has practiced law for 53 years.  During his many years of practice, Woolston represented thousands of defendants in criminal matters.  He estimated that he had represented about 15,000 criminal defendants over his years of practice.  Woolston no longer had his case file as to his representation of Luna because Luna's family obtained the files.  Thus, Woolston was unable to provide any independent recollection of any aspect of Luna's prior cases.

23.     Woolston testified that he did not speak much Spanish, although he had represented Spanish speaking clients during his practice.  He typically had the defendant's family members interpret when he needed assistance or he would obtain an interpreter.  Woolston could offer no evidence as to whether he used an interpreter to communicate with Luna.

24.     Woolston could provide no information specific to his representation of Luna.  He could only testify about what his typical practices were in defending clients.  He clarified that he has no memory of this case and that anything he did testify about came from other people or what he considered his typical practice to have been.  Initially, Woolston testified that he may have recalled one plea discussion with prosecutor David Williams during the Luna proceedings, but then he admitted during further examination that he was not certain he had any first hand recall of plea discussions relating to Luna.  Thus, he could offer no particulars about the government's offer, whether it was communicated to Luna, and if communicated, the reason it was rejected.

### *AUSA David Williams' Testimony:*

25.     David Williams ("Williams") was the government prosecutor from the beginning of Luna's case through the appeal.  Williams testified that he made a standard plea offer to Luna in a letter to Woolston perhaps one or two weeks after Luna's indictment.  The plea offer consisted of a 10-year deal – 5 years for the drug charge and 5 years for the gun charge.  Williams considered Luna the most culpable.  Thus, the plea offer to him was stringent and called for more time than the plea offers to the co-defendants.  This was the only offer made to Luna by the government.  Williams testified that Woolston did not provide any response to him regarding the early plea offer, and he had no plea discussions with Woolston about Luna's case.  Williams made plea offers to co-defendants Gomez and Gandarilla at or near the same time, and he remembered that there was a lot of dialogue and "back and forth" between him and the co-defendants' attorneys regarding the plea offers.  Gomez pled guilty prior to the first trial, but Gandarilla did not plead guilty until immediately before the second trial.  They each received sentences of 30 months, although they each faced a minimum mandatory sentence of 5 years for the drug charges.  Williams testified that Woolston did not respond

to the plea offer and that he, Williams, did not engage Woolston in any other dialogue about a negotiated disposition.  In other words, save for Williams' standard offer, there were no negotiations or "back and forth" discussions with Woolston.

26.     Williams remembered that there was a court-appointed Spanish language interpreter at both of Luna's first and second trials.  Williams did not recall if Luna had a private interpreter seated at the defense table during either trial.  Luna's testimony at the evidentiary hearing was unclear as to whether he had a personal interpreter during his first trial.  Luna believed that his family had paid for an interpreter's services through the first trial.  However, Luna testified that he never asked the interpreter (whether the interpreter was court-appointed or privately retained) to talk to Woolston during the trial because he did not know if he could interrupt the interpreter. With respect to the second trial, Luna testified that Woolston told Luna he did not want Luna to testify at the second trial (unlike the first trial) because they were not going to have a paid interpreter.  Luna further testified that he wanted to speak to Woolston during the second trial but did not feel he could.

## Trial Court Record

27.     On August 26, 1998, Woolston entered an appearance on behalf of Luna.  He also filed a motion to reconsider Luna's detention that was denied.  Woolston did not appeal the denial.

28.     Woolston did not file any other pre-trial motions, in contrast with the co-defendants' attorneys who filed a motion to disclose identity of a confidential informant, an appeal of the denial of detention order for Gomez that was granted, request to identify cooperating witnesses, notice of entrapment defense, motion for independent analysis of the alleged controlled substance, motion to dismiss, and proposed voir dire.  Woolston filed several proposed jury instructions. After a jury found Luna guilty after the second trial, Luna requested that Woolston withdraw as his counsel, and

Woolston moved to withdraw on July 30, 1999 – almost two months after the second trial. Woolston did not file any post-trial motions. Luna was appointed counsel, but his newly appointed counsel's motion for new trial was denied as untimely.

29.     It appears that only a small portion of Luna's second trial was transcribed. The examination of co-defendant Arturo Gandarilla, a key witness for Luna, was transcribed. Gandarilla was Luna's last witness before the defense rested. Gandarilla testified that Luna was not the supplier of drugs on the date in question. Woolston began his examination of Gandarilla by failing to ask the witness his name. The direct examination of this witness was transcribed in 3 double-spaced pages and is cursory and confusing to say the least. At one point, the trial judge noted that the witness appeared to understand the questions while inferring that the questions might not be helpful themselves. [Gandarilla Direct Exam Testimony, p. 6.] On re-direct, which was equally short, it was clear that Woolston was confused about what types of vehicles were involved in the underlying incident. [Gandarilla Re-Direct, p. 38.]

## Analysis

30.     Ineffective assistance of counsel claims are analyzed under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984). To satisfy the Strickland requirements, the movant must prove that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Id. Second, the movant must show that trial counsel's deficient performance prejudiced him to the degree that he was deprived of a fair trial. Id.

31.     In Strickland, the United States Supreme Court emphasized that judicial scrutiny of counsel's performance must be highly deferential. A court should not second-guess counsel's representation after an adverse verdict or sentence. An attorney's performance should be evaluated

12

from counsel's perspective at the pertinent time, thereby eliminating any distorting effects of hindsight.  A court must indulge a strong presumption that counsel's conduct was reasonable and could have been considered sound trial strategy.  Id. at 689, 104 S.Ct. 2052.  To demonstrate prejudice, the movant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

32.     The Strickland test applies to claims of ineffective assistance of counsel involving plea negotiations.  Hill v. Lockhart, 474 U.S. 52, 58, 106 S.Ct. 366 (1985).  The petitioner must establish that his counsel was constitutionally deficient during plea negotiations, and that there was a reasonably probability that but for counsel's errors, he would have accepted a plea offer instead of proceeding to trial.  Id. at 59.  Typically, a defendant's self serving testimony alone will not demonstrate a reasonably probability that he would have accepted a plea deal rather than proceeding to trial.  United States v. Quiroz, 228 F. Supp. 2d 1259, 1265 (D. Kan. 2002).  Instead, the defendant/petitioner must produce objective evidence that he would have accepted the plea.  Id.

33.     An attorney's failure to procure an interpreter can constitute evidence that the attorney's conduct fell outside the range of professionally competent assistance.  Gonzalez v. Phillips, 195 F. Supp. 2d 893, 897, 899 (E.D.Mich. 2001).

> In order to receive a fair trial and to assist in his own defense, a defendant must be able to understand the proceedings against him.  If a defendant does not understand those proceedings and the defendant's attorney is aware or should be aware of the defendant's inability to understand the proceedings, it is incumbent upon that attorney to act on his . . . client's behalf by requesting an interpreter.

Id. at 899.  In addition, the failure to provide an interpreter so that the defendant understood the proceedings and was able to assist in his own defense may demonstrate prejudice.  Id. at 901.  Indeed, where a defendant cannot communicate with his counsel in a shared language, a meaningful attorney-

client relationship could not occur during trial as guaranteed by the Sixth Amendment. The <u>Gonzalez</u> Court viewed such circumstances to be so likely to prejudice the accused that a presumption of prejudice applied. <u>Id.</u> at 902.

34.     Other Courts have further explained that, in certain circumstances, a presumption of prejudice arises that makes it unnecessary to examine the actual performance of counsel. For example, "a complete breakdown in communication between an attorney and client may give rise to such a presumption." <u>United States v. Soto Hernandez</u>, 849 F.2d 1325, 1328 (10th Cir. 1988) (*citing* <u>United States v. Cronic</u>, 466 U.S. 648, 658, 104 S.Ct. 2039 (1984)); <u>Romero v. Furlong</u>, 215 F.3d 1107, 1111 (10th Cir.), *cert. denied*, 531 U.S. 982 (2000). *See also* <u>Ferguson v. Kerner</u>, 2000 WL 1679422 (D. Kan. Nov. 6, 2000) (total lack of communication between petitioner and counsel resulted in a constructive denial of counsel, and prejudice, under such circumstances, is presumed), *report and recommendation adopted*, 131 F. Supp. 2d 1208 (D. Kan. 2001), *aff'd*, 2002 WL 467947 (10th Cir. Mar. 28, 2002).

35.     Luna contends that Woolston's representation of him fell below an objective standard of reasonableness in a number of ways and that there is a reasonable probability, but for those the alleged errors, that the outcome of his case would have been different. Court appointed interpreters were present for both trials. Luna's claim deals with Woolston's alleged failure to have an interpreter present to assist in pretrial discussions, trial preparation and plea discussions. Luna also contends Woolston should have had an additional private interpreter at trial to allow Luna to communicate with Woolston while the official interpreter was translating the testimony. Thus, the errors alleged by Luna relate primarily to communications or lack thereof with his attorney prior to trial regarding penalties that he faced under the sentencing guidelines, chances of success at trial, plea offers and/or

failure to negotiate a plea and advocate for a mitigated role for Luna whom defense counsel characterized as the "mule" rather than the hands-on participants, both of whom received lesser sentences. The lack of meaningful communication between Woolston and Luna, according to Luna, was caused or exacerbated by Woolston's inability to speak Spanish and/or his interpreters' poor Spanish translation skills.

36. The government argues generally that Luna had a fair trial and cannot meet the Strickland standard merely by claiming he is unhappy with the results. The government states that Luna had no right to a "perfect trial," that it was sufficient that Luna had an interpreter at trial and that a "valid cohesive defense was presented." While this statement is true, under the facts of this case where Woolston is unable to refute Luna's contentions, the government's position and closing argument are unconvincing.

37. Here, Luna presented undisputed evidence that there was an inability to communicate and a breakdown in communications with his attorney, particularly during pre-trial stages, as well as at trial. The lack of communication resulted not through any fault of Luna, but because his attorney did not provide adequate interpretative services for him. Pressing into service other inmates, strangers, co-workers or family members whose interpretative skills are unknown contributed to the communications problem. Luna testified that he did not understand the benefits of a plea, what to expect at trial or what to expect with respect to anticipated examination or testimony of witnesses. Luna further testified that documents were not translated for him and therefore, he did not have an understanding of the government's evidence. During some communications with Luna, Luna relied on an inmate's English to Spanish interpretation of Woolston's statements.

15

38.     Luna also testified that he did not understand a plea offer had been made that consisted of a 10-year deal, and that the sentence guideline ranges were never explained to him.  Thus, Luna was not provided with key information about a crucial decision.  Instead, the uncontested evidence is that Luna was told about a 5 year deal that the government asserts was never offered, and that the inmate who translated for Woolston communicated to Luna that he should proceed to trial because he had a 99% chance of winning.  Whether Luna actually received mistaken advice or a mistaken translation or whether he simply did not understand Woolston's interpreter, due to poor translations, makes little difference – because it is clear that Luna essentially was deprived of assistance of counsel at a critical stage of the proceedings.  "[A] trial is unfair if the accused is denied counsel at a critical stage of his trial."  Cronic, 466 U.S. at 659.  It is unquestionable that the plea process is a critical stage of the criminal proceeding against an accused.  "[D]efense counsel 'must give the client the benefit of counsel's professional advice on this crucial decision' of whether to plead guilty."  Purdy v. United States, 208 F.3d 41, 44 (2d Cir. 2000) (internal citations omitted).  As part of an attorney's advice to his client, he must communicate the terms of a plea offer to the defendant,

> and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed.  "[K]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty."

Id. at 45 (internal citations omitted).

39.     The Court is careful to note that the translation problems referred to occurred in pretrial matters.  The Court itself provided certified interpreters to Luna at trial and the Court does not conclude that Luna was entitled to a second, personal interpreter.

16

40.    Again, whether Woolston failed to provide this key information at a critical stage of the proceeding or simply did not communicate the information in a language Luna could understand is not the point.  It is undisputed by Woolston, who has no recollection of Luna or his defense of Luna, that Luna was not provided the information to which he was entitled.  The Court's view might well be different if Woolston could refute the allegations and provide evidence that he communicated a ten year plea to Luna that Luna rejected, that Woolston reviewed with Luna the likely evidence that would be offered against him, or that the purported "99% chance of winning" conversation never took place and was just Luna's wishful thinking.  Indeed, if any other credible evidence were marshaled to refute Luna's testimony, say for example, the testimony of the inmate who allegedly translated Woolston's telephone call, or testimony of Woolston's legal assistants or staff members who worked on the case, the Court would have less difficulty in denying Luna's contentions.  But such is not the case.

41.    Moreover, it is undisputed, based on testimony by Williams, that Woolston never engaged in any type of plea negotiations with the government as to Luna.  This inaction by Woolston supports Luna's testimony that he was denied effective assistance of counsel at a critical stage of the proceedings and that Woolston's performance was deficient.  Deficient performance of counsel, sufficient to meet the first prong of the <u>Strickland</u> test, is demonstrated where defense counsel provided significantly inaccurate calculation of sentencing ranges upon a plea and upon conviction after trial or where defense counsel grossly underestimated[3] the maximum sentencing exposure.  <u>Aied</u>

---

[3]Here, it could be argued that Luna's sentence of 12½ years after conviction is not significantly different than the 10 year deal that the government asserts was offered to Luna.  However, it is difficult to say that 2½ years is not a "significant" difference to one serving a prison sentence.  Moreover, according to Luna's unchallenged testimony, Woolston told him of a 5 year offer, which is even more significantly different than the term he is serving.

v. Bennett, 296 F.3d 58, 62-63 (2d Cir. 2002) (internal citations omitted).  The Court concludes that Luna has sufficiently satisfied the first prong of the Strickland inquiry.

42.     Because the Court finds that there was a complete breakdown of communication between Woolston and Luna, it concludes that a presumption of prejudice applies.  If Luna is to be believed, and there is no testimony to the contrary from Woolston, no meaningful relationship existed between Luna and Woolston due to the language difficulties.  This certainly is true during the plea negotiation stage of this matter.  If there was no meaningful relationship between a defendant and his attorney, there was a constructive denial of counsel, and prejudice is presumed.  Based on the lack of communication, Luna was unable to make an informed decision about a plea offer and it is highly unlikely that defense counsel was able to subject the prosecution's case to a meaningful adversarial testing.  Thus, the Court finds that the second prong of Strickland is satisfied due to the presumption of prejudice that applies.  Conduct of counsel need not be examined further.[4]

43.     In reaching the conclusion that Luna was denied effective of assistance of counsel, the Court is primarily influenced by the fact that Woolston was unable to contradict any of the testimony Luna provided.  However, in addition, the Court cannot overlook the Honorable Martha Vazquez's comments at sentencing because it was she who observed the actual underlying proceedings.

---

[4]Even if the Court were to find that a presumption of prejudice did not apply, it appears likely that there is objective evidence to demonstrate prejudice.  While Luna did not expressly state he would have accepted a plea deal had he understood the offer, this is because he never appeared to understand what might have been offered to him.  It is undisputed that a written offer was made to Luna, although it was never translated so that he could understand it.  It also is undisputed that Woolston did not discuss the plea offer with the government and did not attempt to negotiate the terms of that offer in any way.  Williams testified that he made an offer to Woolston, that Woolston never accepted or rejected the offer, and that there were no follow-up negotiations.  Had Woolston adequately informed Luna of the terms, there very well may have been a reasonable probability that he would have been offered a significantly better deal than the 12½ years of imprisonment he received and that he would have accepted the offer.

I have to say that it was difficult to assess Mr. Luna's role for me as an independent observer of the testimony that went before the jury. I am very concerned about the fact that Mr. Luna may not have received effective assistance of counsel.  This is a case that cries out for a fair treatment of Mr. Luna, and one of the reasons that it is so important to have adequate representation of counsel is to make sure that a miscarriage of justice does not occur.

Mr. Woolston's representation of Mr. Luna, in my opinion, was below the standard, but by the time the motion [for new trial by Attorney Robert] is filed, I had lost jurisdiction of this case.  I have to say, however, that I am concerned that Mr. Luna did not receive a fair trial in this case and that Mr. Woolston was not as prepared as he should have been.

I can remember even today Mr. Woolston not even having straight the colors of the cars that were involved and just causing total confusion when he was referring to diagrams, and it was very difficult to follow the points that he was making because he kept getting people's names wrong, he kept getting the cars wrong, and the colors of the cars wrong and, you know, the whole thing was really rather difficult to follow.

. . . .

I'm sorry, I thought about something else that I think needs to be said. Mr. Williams did offer Mr. Luna a pretty fair offer at the beginning of this case and actually continued to offer it even the morning of trial, if I'm recalling correctly.  I was informed that it had been accepted and then it hadn't, so we proceeded with trial.  But I am concerned that Mr. Woolston did not have the kind of relationship with Mr. Luna that he would have been able to advise him of how likely it would have been for him to be convicted and thus facing 78 months plus a consecutive period of 60 months on top of that.  But in any event, I do believe that was another aspect of the representation besides the trial representation that was critical to Mr. Luna's case.

[Transcript of Sentencing Proceedings, pp. 7-9, Ex. B in support of § 2255 Motion.]

44.     It is clear that the trial judge was deeply troubled over the adequacy of representation, and implied that had a timely motion for a new trial been filed, a different result might have occurred. Id.

### Conclusion

45.     Because the Court recommends granting Luna's § 2255 petition, on the grounds that his Sixth Amendment right to effective assistance of counsel was violated, the remedy "should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." Quiroz, 228 F. Supp. at 1266 (internal citation omitted). The Sixth Amendment violation should "neutralize" the constitutional deprivation. Here, the Court determined that counsel's assistance was deficient particularly during the plea negotiations. Therefore, the prosecution is free to offer Luna another plea bargain, but "any plea offer in excess of the original offer must overcome a rebuttable presumption of prosecutorial vindictiveness." Id. (internal citation omitted).

46.     However, in addition, should Luna reject the plea offer, he will be entitled to a new trial because the Court also finds that there is sufficient evidence demonstrated that trial counsel's performance during trial was deficient and that there was a reasonable probability of a different outcome.

## **Recommended Disposition**

47.     That Luna's § 2255 motion be granted to the extent that he be offered another plea bargain and that if it is rejected, he be granted a new trial, either or both of which should take place within a reasonable period of time.


_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge